# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | No. 74038-5-I |
| | ) | |
| M.M., | ) | DIVISION ONE |
| | ) | |
| Appellant. | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | FILED: October 3, 2016 |

MANN, J. — M.M. seeks reversal of a decision revoking a least restrictive alternative order and remanding him for inpatient treatment. He contends that the State did not cite to, or comply with, the law in effect at the time it sought to revoke the least restrictive alternative order. He contends further that the trial court then erred by applying the outdated statute and failing to consider all of the factors set forth in the amended and recodified statute. Review of the record and the trial court's final order indicates that all of the statutorily mandated factors were considered by the trial court even though the State's petition erroneously cited the outdated version of the applicable statute, RCW 71.05.590. Therefore, we affirm.

## FACTS

M.M. was diagnosed with unspecified psychosis and epilepsy. On July 8, 2015, Designated Mental Health Professional (DMHP)[1] Charlene McKinley filed a petition to place M.M. on an involuntary treatment hold pursuant to chapter 71.05 RCW. After evaluating M.M., Fairfax Hospital filed a petition for 14-day involuntary treatment on July 10, 2015, and the court ordered M.M. to be held at Fairfax Hospital for a period not to exceed 14 days. The court found that M.M. presented a likelihood of serious harm to others and that treatment in a less restrictive alternative setting was not in the best interest of M.M. or others. RCW 71.05.240. On July 22, 2015, Fairfax Hospital petitioned for an additional 90-day restrictive involuntary treatment ("Commitment Petition").[2]

On August 12, 2015, M.M. entered into an agreed Less Restrictive Alternative, and an order was entered to that effect (LRO). The LRO was set to expire on November 10, 2015. The LRO specified in part that M.M. would:

    A. Reside at mental health treatment provider approved housing and follow all house rules and regulations.
    B. Attend all appointments with and follow treatment recommendations of Jessie Leone . . . .
    C. Take all medications as prescribed, including medications prescribed while in or being discharged from the hospital. [3]

M.M. was released from the hospital that same day. On August 23, 2015, DMHP Jared Lathrop-Weber filed a petition to revoke M.M.'s LRO. M.M. was homeless and had presented himself at Harborview Medical Center. The petition alleged that M.M.

---

[1] "Designated mental health professional[s]" are "mental health professional[s] designated by the county or other authority authorized in rule to perform the duties specified in [chapter 71.05 RCW]," which deals with evaluation, treatment and commitment of individuals with mental illness. RCW 71.05.020(11).
[2] Clerk's Papers (CP) at 23.

was failing to adhere to the terms and conditions of his LRO, demonstrated substantial deterioration of functioning, showed evidence of substantial decompensation, and posed a likelihood of serious harm. M.M. was making psychotic statements regarding the medication he received from Fairfax. He reported that he was not taking his medication—including needed medication for epilepsy—while continuing to drive. M.M. was unable to care for his health and safety in the community. The record does not indicate whether any action was taken on this petition, but M.M. was apparently taken into custody and then released from the hospital on September 2, 2015, still subject to the terms of the LRO.

On September 14, 2015, DMHP Julie Gamble filed a second petition to revoke the LRO ("Revocation Petition"). The Revocation Petition cited to RCW 71.05.320 and/or RCW 71.05.340, RCW 71.05.340(3)(a), and included allegations that M.M.: (1) is failing to adhere to the terms and conditions of the LRO; and/or (2) demonstrating a substantial deterioration of functioning; and (3) poses a likelihood of serious harm.

Gamble alleged that M.M. was referred for evaluation by his family and by his case manager at Downtown Emergency Services Center (DESC), the agency supervising M.M.'s LRO. She further alleged that M.M. was refusing to take his psychiatric medications since his release on September 2 and refusing to participate in mental health treatment. She alleged that M.M. "presents as substantially deteriorated [and] poses a likelihood of serious harm in that he has a history of serious assault on family . . . (in 2013 he beat his brother and broke his nose)."[4] Thus, Gamble alleged that continued release was not in the best interest of M.M. or the community. In support

---

[3] CP at 32.
[4] CP at 49.

3

of the Revocation Petition, Gamble attached a declaration written by Avery Fisher, M.M.'s DESC case manager. Fisher stated that M.M. was failing to comply with the terms and conditions of the LRO by refusing to take medication as prescribed and declining to participate in mental health treatment, and that he presents evidence of substantial decompensation, and poses a likelihood of serious harm. She noted that M.M. "has a history of violence against others per Harborview records."[5] She stated that she offered M.M. "one-on-one mental health case management and medications" for his psychiatric disorder, but he declined.[6]

At the revocation hearing on September 18, 2015, four witnesses testified as to events occurring both prior and subsequent to entry of the LRO. Angela McGrath, M.M.'s mother, testified that she did not believe M.M. was taking his psychiatric medications because on September 4, 2015, she found a prescription bottle full of 30 pills inside the trailer where M.M. was staying. She also testified regarding events occurring before entry of the LRO on August 12, 2015. She testified that in July 2015, M.M. had been violent with her, blocked her passage out of the kitchen, grabbed her by the waist, and pulled her out onto the deck. McGrath fled and secured an order of protection preventing M.M. from coming within 50 feet of her.

Jan Rose Ottaway Martin was M.M.'s DESC case manager. She testified at the revocation hearing by reading M.M.'s progress notes into the record. The notes indicated that M.M. was not following through with DESC's mental health treatment plan or taking his medications. Specifically, M.M. failed to appear for his pre-arranged intake appointment on August 21, and he was hospitalized at Harborview on September 2,

---

[5] CP at 52.
[6] CP at 52.

2015, where case manager Avery Fischer evaluated him. M.M. declined the services offered by DESC. M.M. wanted to switch to a different mental health agency in Auburn, but a Harborview social worker relayed that no local mental health facility would take M.M.'s case so he needed to continue to work with DESC in Seattle. M.M. met briefly with his case manager on September 9, but declined to schedule a follow-up appointment. M.M. said he would find his own housing and did not show up for another appointment. Ottaway Martin did not call the DMHP because she did not believe M.M. was a danger to himself or others.

On September 21, 2015, Alexandra Hughes, Licensed Mental Health Counselor and court evaluator for Navos Hospital, testified. At this point, M.M. was an inpatient at Navos, and Hughes testified as to her evaluation of him based on her personal interview with him, review of his medical chart, discussions with his treatment team, and the testimony of the two prior witnesses. She testified that M.M.'s diagnosis of unspecified psychosis had a substantial adverse effect on his cognitive and volitional functions. She testified that M.M. had told her he was taking his medications but was hospitalized for not going to "psychology," which Hughes interpreted to mean as failing to attend his appointments with his outpatient provider.[7] M.M. showed Hughes a piece of paper that named two agencies, one in Auburn and one in Tacoma, that M.M. attempted to contact in order to obtain treatment. He told Hughes that he had been unable to get an appointment with either agency before being hospitalized.

Hughes then read M.M.'s progress notes from his current Navos hospitalization into the record. The notes indicated that M.M. was previously hospitalized at Navos in 2013 after he assaulted his brother by punching and attempting to choke him. On

September 14, 2015, M.M. was observed to be weak in insight, physical health, knowledge of medication and illness, self-care, motivation for treatment, and independent living skills. M.M. was found to be very resistant to the mental health system and adamant about not taking medications. M.M. admitted blocking his mom into a room and fighting with his brother, but he stated that his prior hospitalizations were because his mom went "super crazy."[8] As to treatment with DESC, M.M. stated that he would not talk to "that weirdo again."[9]

Hughes testified that on September 16, 2015, M.M. was delusional, expressed paranoia about a peer pacing in his room and about his mother, and was sexually inappropriate with a female staff member by attempting to sit on her lap. On September 17, 2015, M.M. exhibited poor hygiene, was irritable and angry, had rapid and pressured speech, tangential thought processes, a persecutory delusional mood, hallucinations, and paranoia, and acknowledged that his mood was "very unstable right now."[10] On September 18, M.M. blocked staff's path with his arm and body after being told several times to move away. He stood in front of the elevator and refused to move, forcing another staff member to intervene. On September 20, M.M. exhibited poor hygiene and suspicion, his mood was irritable and angry, and his speech was rapid and pressured. He continued to exhibit paranoia and hallucinations. His judgment and insight were impaired.

Hughes recommended further inpatient treatment. She opined that M.M. should not be released in accordance with the LRO because his symptoms were unstable, he

---

[7] Report of Proceedings (RP) (Sept. 21, 2015) at 8.
[8] RP (Sept. 21, 2015) at 10.
[9] RP (Sept. 21, 2015) at 11.
[10] RP (Sept. 21, 2015) at 13.

lacked insight, and he would be unable to follow the conditions of the LRO. She acknowledged that, since being hospitalized, M.M. was largely medication compliant, had periods of calm, and he had not exhibited behavioral issues the previous weekend. Nonetheless, she recommended further inpatient treatment so his medications could be monitored.

M.M. then testified, claiming that he was taking his medications as prescribed but, because he kept losing the pills, he had filled five prescriptions. He explained that the pills at his mother's house were quick release and they caused him nightmares. On cross-examination, he said he had three bottles of pills, not five, and he was unable to explain where he had each prescription filled or which doctor prescribed each one. He admitted he was not taking his seizure medication and acknowledged that he had been without his pills for "probably six" days.[11] He claimed that if the trial court modified the LRO but allowed him to be discharged from the hospital, he would follow through with the other providers.

The trial court issued its ruling revoking the LRO. The court found clear, cogent, and convincing evidence that M.M. had violated the terms and conditions of the LRO by failing to take all the medications as prescribed and by not attending all appointments and following the treatment recommendations of DESC. The court also found that there was insufficient evidence for a finding by clear, cogent, and convincing evidence that M.M. was demonstrating substantial deterioration or posed a likelihood of serious harm. The trial court ordered that M.M. be remanded to Navos inpatient services for a period not to exceed 90 days from entry of the LRO. M.M. appeals.

7

## ANALYSIS

A. Failure to Raise Issue Below

During the hearing, M.M. failed to raise the issue of whether the Revocation Petition invoked the correct law, and the State now argues that his failure to do so means that this court should refuse to review his claim. See RAP 2.5(a) ("appellate court may refuse to review any claim of error which was not raised in the trial court"); Washburn v. Brett Equip. Co., 120 Wn.2d 246, 290, 840 P.2d 860 (1992) (recognizing that arguments or theories not presented to the trial court will not be considered on appeal). M.M. maintains that he is entitled to raise this issue for the first time on appeal because the trial court is obligated to follow the applicable law. See generally, Maynard Inv. Co. v. McCann, 77 Wn.2d 616, 621, 465 P.2d 657 (1970) (noting that when the question is "of such a character as to render the judgment of the lower court void," an appellate court will consider the issue even though it was not raised below); In re Dependency of G.C.B., 73 Wn. App. 708, 716-17, 870 P.2d 1037 (1994) (appellate court had duty to apply dispositive statute despite parties' failure to call the court's attention to that statute when application of the statute directly affected, and invalidated, the trial court's findings and decision). We disagree that the trial court's obligation to follow the applicable law warrants an exception to the usual waiver rule in this case because there is nothing in the trial court's decision that is contrary to, or invalidated by, existing law.

Even though we are unpersuaded that M.M.'s appeal raises an issue that could render the trial court's judgment void, we also understand M.M. to argue that there was insufficient evidence to support the trial court's decision. We agree with M.M. that a

---

[11] RP (Sept. 21, 2015) at 34.

challenge to the sufficiency of the evidence may be raised at any time. See RAP 2.5(a)(2) (party may raise "failure to establish facts upon which relief can be granted" for the first time on appeal).[12] Under these circumstances, we exercise our discretion to decide M.M.'s appeal on the merits.

## B. Order of Involuntary Commitment

In general, this court will review an order requiring involuntary treatment to determine whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and the judgment. In re Detention of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). An individual who has been involuntarily committed for a 14-day period of intensive treatment may be committed for an additional 90 days if that person, after being taken into custody, has threatened, attempted, or inflicted physical harm upon himself or herself or another and, as a result of a mental disorder, presents a likelihood of serious injury, is gravely disabled, or is in need of assisted mental health treatment. RCW 71.05.280(1), (2), (4), (5); RCW 71.05.320. The individual may be ordered to a less restrictive alternative than institutional commitment if it is in that person's best interest. RCW 71.05.320(2). In this case, M.M. was initially committed because he presented a likelihood of serious harm to others. He then voluntarily entered into the LRO.

In order to revoke the LRO, the State had to introduce clear, cogent, and convincing evidence showing that: "(a) [t]he person is failing to adhere to the terms and

---

[12] In addition, although the 90-day commitment order has long since expired, the State concedes that this case is not moot in that the trial court's order may have adverse consequences on future involuntary treatment determinations. See In re Det. of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012) (recognizing that an order of involuntary commitment may be evidence in a subsequent commitment proceeding, and therefore "[a]n individual's release from [involuntary] detention does not render an appeal moot").

conditions of the court order; (b) [s]ubstantial deterioration in the person's functioning has occurred; (c) [t]here is evidence of substantial decompensation with a reasonable probability that the decompensation can be reversed by further evaluation, intervention, or treatment; or (d) [t]he person poses a likelihood of serious harm." RCW 71.05.590(1); RCW 7.05.310; see In re Detention of LaBelle, 107 Wn.2d at 209 (stating burden of proof for involuntary commitment). Under the former law, RCW 71.05.340(3)(a) (2009), the same evidentiary showing was required. It specified that a conditional release could be modified or revoked if, (i) the "conditionally released person is failing to adhere to the terms and conditions of his or her release; (ii) [s]ubstantial deterioration in a conditionally released person's functioning has occurred; (iii) [t]here is evidence of substantial decompensation with a reasonable probability that the decompensation can be reversed by further inpatient treatment; or (iv) [t]he person poses a likelihood of serious harm."

When RCW 71.05.340(3) was recodified and replaced with RCW 71.05.590(1), the grounds for revoking a LRO or conditional release did not change. However, the recodified statute added language outlining factors that should be applied, and a range of actions that should be considered, in determining whether to enforce, modify, or revoke a least restrictive alternative or conditional release order. RCW 71.05.590(2), (5). Even though the statutory grounds for revocation have not changed, but only recodified, M.M. argues that the Revocation Petition was defective and the trial court erred in its analysis because neither the Petition nor the trial court recognized the changes in the law. We disagree.

Section 71.05.590(2) provides in part that:

(2) Actions taken under this section must include a flexible range of responses of varying levels of intensity appropriate to the circumstances and consistent with the interests of the individual and the public in personal autonomy, safety, recovery, and compliance. Available actions may include, but are not limited to, any of the following: (a) To counsel, advise, or admonish the person as to their rights and responsibilities under the court order, and to offer appropriate incentives to motivate compliance; (b) To increase the intensity of outpatient services provided to the person by increasing the frequency of contacts with the provider, referring the person for an assessment for assertive community services, or by other means;

RCW 71.05.590(2).

There was ample evidence set forth in the Revocation Petition and at the revocation hearing regarding the "flexible range of responses" taken by mental health personnel. First, there was an earlier petition to revoke the LRO that did not result in revocation, but instead M.M. was discharged pursuant to the LRO. In addition, Ottaway Martin testified that she did not initially consider revocation of the LRO because M.M. was not considered to be a danger to himself or others. Furthermore, case management services were offered to M.M. but he declined, and Fisher made efforts to counsel and admonish M.M. to continue treatment.

After considering the written record and hearing testimony, the trial court carefully examined the alternatives open to it. It reflected that M.M.'s condition had not significantly worsened since the LRO was entered. It also noted that M.M. was admittedly failing to follow the terms and conditions of the LRO. The trial court then observed that M.M. was compliant now that he was hospitalized and, if he continued to be so, he might be eligible for release before the end of the 90-day period specified in the LRO.

11

Turning to RCW 71.05.590(5), the State and the trial court are now instructed that:

> In determining whether or not to take action under this section the designated mental health professional, agency, or facility must consider the factors specified under RCW 71.05.212 and the court must consider the factors specified under RCW 71.05.245 as they apply to the question of whether to enforce, modify, or revoke a court order for involuntary treatment.

M.M. argues that the trial court failed to consider the factors specified under RCW 71.05.212 and RCW 71.05.245, but we disagree. RCW 71.05.212 requires consideration of "all reasonably available information from credible witnesses and records regarding" matters such as prior recommendations about the need for civil commitment when that recommendation is made pursuant to chapter 10.77 RCW (addressing criminal insanity procedures), historical behavior, "[p]rior determinations of incompetency . . . under chapter 10.77 RCW," and "[p]rior commitments under this chapter." RCW 71.05.212(1)(a)-(d).

RCW 71.05.212 applies whenever a professional "is conducting an evaluation under" chapter 71.05 RCW, not just solely or specifically to petitions to modify or revoke an LRO. RCW 71.05.212(1). Thus, information from "credible witnesses and records" was relevant in the Commitment Petition.[13] Because M.M. entered into the agreed LRO, the court did not need to consider this information in ruling on the Commitment Petition. At the revocation hearing, testimony from credible witnesses as to prior commitments and historical behavior was introduced and considered.

---

[13] CP at 23.

Turning next to the factors set forth in RCW 71.05.245, this section applies to all determinations of grave disability, likelihood of serious harm, or need of assisted outpatient treatment. It also requires that all available evidence about the person's historical behavior be considered. RCW 71.05.245. These factors were taken into account because the State introduced, and the trial court considered evidence about M.M.'s historical behavior in the form of the Revocation Petition and attachments and testimony from the State's witnesses. The Revocation Petition addressed M.M.'s history of serious assaults. M.M.'s mother described his behavior prior to hospitalization. The trial court heard about M.M.'s previous hospitalizations. Ottaway Martin testified regarding M.M.'s behavior prior to the Revocation Petition. Hughes testified as to the historical information contained in M.M.'s hospital records.

Consideration of the written record and testimony led the trial court to specifically find that M.M. did not present a likelihood of serious harm or substantial deterioration. However, this information also supported the trial court's decision to revoke the LRO based upon M.M.'s failure to take his prescriptions and attend mental health appointments. To summarize, the written record and hearing proceedings indicate that the factors and considerations required by RCW 71.05.590(2) and (5) were taken into account and satisfied in this case.

C. Effect of Incorrect Citation

Finally, M.M. claims he was prejudiced because the Revocation Petition cited to RCW 71.05.340(3) instead of RCW 71.05.590, the latter of which took effect July 24,

2015. Because M.M. did not raise this issue below, we review his contentions to determine whether or not he was prejudiced by any errors in the Revocation Petition. Cf. State v. Hopper, 118 Wn. 2d 151, 155-56, 822 P.2d 775, (1992) (when a deficiency in a charging instrument is raised for the first time on appeal, "this court should examine the document to determine if there is any fair construction by which the elements are all contained in the document" and whether the defendant has suffered any prejudice due to the deficiencies); see e.g., State v. Borrero, 97 Wn. App. 101, 107-08, 982 P.2d 1187 (1999) (holding that error in criminal information is not a basis for reversal absent prejudice).[14]

While M.M. is correct that a court must apply the law in effect at the time it renders its decision, there is no indication that he was prejudiced by any error because he has failed to identify any evidence or criteria that was not considered, but should have been. Cf. Hopper, 118 Wn.2d at 156 ("If the information contains allegations that express the crime which was meant to be charged, it is sufficient even though it does not contain the statutory language.").

In Hopper, the defendant argued that the criminal information was insufficient because it cited to the wrong statute. Hopper, 118 Wn.2d at 159 (noting that the information cited to a statute not yet in effect on the date of the crime). Our Supreme Court disagreed and held that "[e]rror in the citation or its omission shall not be ground for dismissal of the indictment or information or for reversal of a conviction if the error or omission did not mislead the defendant to the defendant's prejudice." Hopper, 118 Wn.2d at 159-60 (quoting CrR 2.1(b)).

---

[14] While Hopper and Borrero are criminal cases, we agree with the State that the effect of an error in citation in a criminal information is analogous to the situation here.

The Court noted that it had "consistently upheld convictions based on charging documents which contained technical defects such as this one." Hopper, 118 Wn.2d at 160.

M.M. relies on this court's decision in In re Dependency of A.M.M., 182 Wn. App. 776, 332 P.3d 500 (2014), to support his claim of prejudice but that reliance is misplaced. In A.M.M., this court reversed an order terminating an incarcerated father's parental rights because the trial court failed to apply the law in effect at the time of its ruling. A.M.M., 182 Wn. App. at 789-90. The applicable statute required an explicit finding by the trial court as to whether the incarcerated parent maintained a meaningful role in the children's lives, and it required the trial court to consider whether the State made reasonable efforts to facilitate such contact. A.M.M., 182 Wn. App. at 786-87; see RCW 13.34.180(1)(f). In A.M.M., there was no evidence in the record suggesting that the Department of Social Services and Health presented such evidence in satisfaction of its burden or that the trial court made any such findings. A.M.M., 182 Wn. App. at 788-90. Thus, the termination order was reversed. A.M.M., 182 Wn. App. at 790.

In this case, there was ample evidence that the State and the trial court considered all relevant information from credible witnesses and records, and M.M. has failed to identify any missing information. Moreover, although M.M. contends that there were mitigating circumstances regarding the violations of the LRO such as the fact that he accidentally lost his medication and that he had

been trying to make appointments with other providers, that information was considered by the trial court and found to be unpersuasive.

## CONCLUSION

Based upon the foregoing, we affirm the order revoking M.M.'s LRO and remanding him for treatment at Navos.

Mann, J

WE CONCUR:

Leach, J.

Trickey, ACJ